West SHELL, Jr., et al., Plaintiffs,

v.

R.W. STURGE LTD., et al., Defendants.

No. C–1–93–802.

United States District Court,
S.D. Ohio, W.D.

Dec. 22, 1993.

John Ledyard Campbell, Kohnen, Patton & Hunt, Virginia Conlan Whitman, Cincinnati, OH, for plaintiffs.

Charles Joseph Faruki, Faruki Gilliam & Ireland, Dayton, OH, for defendants.

### ORDER

HERMAN J. WEBER, District Judge.

On November 1, 1993, plaintiffs filed this action in the Hamilton County Court of Common Pleas alleging that defendants violated Ohio securities law by selling unregistered and non-exempt securities. On November 2, 1993, the Court of Common Pleas issued an ex parte temporary restraining order enjoining defendants from presenting to any bank letters of credit which plaintiffs had executed in support of their transactions with defendants. The Court of Common Pleas granted a fourteen day extension of the TRO on November 14, 1993.

On November 16, 1993, defendants removed the case to this Court, and the matter was referred to the United States Magistrate Judge. Plaintiffs then filed a supplemental motion for preliminary injunction (doc. no. 7), and defendants filed a motion to dismiss for improper venue (doc. no. 8). The Magistrate Judge held hearings on November 24, 1993, and December 7, 1993, during which the parties presented evidence and oral arguments. The parties filed post-hearing memoranda and briefs.

On December 10, 1993, the Magistrate Judge filed a Report and Recommendation recommending that defendants' motion to dismiss for improper venue be granted. The Magistrate Judge also recommended granting plaintiffs' motion for a preliminary injunction in the event this Court denies defendants' motion to dismiss.

This matter is before the Court upon the Report and Recommendation of the United States Magistrate Judge (doc. no. 26), defendants' objections (doc. no. 27), plaintiffs' objections (doc. no. 28), plaintiffs' memorandum in opposition to defendants' objections (doc. no. 29), and the parties' proposed findings of fact and conclusions of law (doc. nos. 31, 32). This Court held a hearing on December 20, 1993, during which the parties presented oral arguments on their objections to the Report and Recommendation.

### I.

Following a detailed analysis of plaintiffs' contentions, the Magistrate Judge concluded that defendants' motion to dismiss should be granted, because the parties' agreement contained the following enforceable forum selection clause:

Each party hereto irrevocably agrees that the court of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of and/or underwriting business at Lloyd's ...

*Id.* at 7 (citing doc. no. 10, attachments to Exh. D).

Plaintiffs contend that the Magistrate Judge erred in concluding that the forum selection clause is enforceable.

Since the parties have submitted evidence in support of their positions on defendants' motion to dismiss, the motion is properly treated as a motion for summary judgment under Fed.R.Civ.P. 56. *See* Fed.R.Civ.P. 12(b). The legal standard for consideration and disposition of issues on summary judgment is well settled and is set forth in *Goldstein v. D.D.B. Needham,* 740 F.Supp. 461, 463 (S.D. Ohio 1990).

The Magistrate Judge accurately set forth the following legal standards concerning the enforceability of a forum selection clause:

A forum selection clause in an international agreement is to be enforced 'absent a strong showing that it should be set aside.' *The Bremen,* 407 U.S. at 15 [92 S.Ct. at 1916][1] ... This presumption of validity may be overcome upon a showing that the forum selection clause is 'unreasonable under the circumstances,' *The Bremen,* 407 U.S. at 10 [92 S.Ct. at 1913]. For Example: if its incorporation into the agreement was the result of fraud or overreaching, *id.* at 12–13 [92 S.Ct. at 1914–15];

---

1. *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972).

if the complaining party will for all practical purposes be deprived of his day in court due to the grave inconvenience or unfairness of the selected forum, *id.* at 18 [92 S.Ct. at 1917–18]; if the forum selection clause contravenes a strong public policy of the forum state, *id.* at 15 [92 S.Ct. at 1916]; or, if the fundamental unfairness of the chosen law may deprive plaintiff of a remedy.

(doc. no. 26, p. 8). Plaintiffs concede that the above constitutes an accurate statement of the legal standards applicable to determining whether a forum selection clause is enforceable (doc. no. 28, p. 5). Plaintiffs, however, challenge the Magistrate Judge's application of these standards.

Plaintiffs argue that the Magistrate Judge improperly weighed Ohio's public policy against preserving the integrity of international business transactions. According to plaintiffs, they must show that the forum selection clause is unreasonable because its enforcement would contravene a strong public policy of the forum state. "Plaintiffs need not prove that the public policy behind the State's Blue Sky Laws outweighs the policy concerns behind preserving the integrity of international business transactions." (doc. no. 28, p. 7).

Plaintiffs' contentions lack merit. The Magistrate Judge properly applied the legal standards set forth in *The Bremen.* Criticizing the Magistrate Judge's analysis based on his decision to "weigh" Ohio's policy against the policy concerns behind preserving the integrity of international transactions does little to assist plaintiffs. The precise term used in *The Bremen* is "contravene"—that is, the presumption of validity applies to a forum selection clause unless "enforcement would contravene a strong public policy of the forum ..." 407 U.S. at 15, 92 S.Ct. at 1916. Whether a Ohio's public policy "outweighs"—exceeds in weight, value, or importance[2]—or "contravenes"—obstructs the operation of; contradicts[3]—is a distinction without significance. The issue, as framed in *The Bremen,* is whether enforcement of the forum selection clause would be "unreason-

able." *Id.* Enforcing a forum selection clause would be "unreasonable" in the instant case if Ohio's public policy either outweighs or contravenes the need to preserve the integrity of international transactions. Ohio's public policy does neither. The Magistrate Judge correctly analyzed plaintiffs' contentions in this regard:

> Plaintiffs concede that if they had brought claims based on violations of federal securities law or claims based on violations of the Ohio Blue Sky Laws sounding in fraud and/or nondisclosure, venue in this Court would be improper. This concession, which is supported by the great weight of legal authority, is an admission that the state and federal policies underlying protection for investors against fraud and nondisclosure must bow to the competing interest in protecting the integrity of international agreements.

> \* \* \* \* \* \*

> Plaintiffs have not provided any convincing evidence or authority that [Ohio's] merit review process evinces a greater public interest than the prevention of fraud and nondisclosure. To the contrary, the policy concerns behind the prevention of fraud, an intentional wrongful act, are of greater importance and warrant more protection and enforcement than the policy concerns behind [Ohio's] merit review, which are designed to protect investors from the foibles inherent in their own lack of knowledge, lack of business sophistication and greed.

(doc. no. 26, p. 10). None of the plaintiffs in the instant case claim to lack business knowledge. It is uncontroverted that plaintiffs are sophisticated investors who were fully aware of the nature and consequences of their investments with defendants.

The Magistrate Judge's analysis, moreover, is consistent with *The Bremen* and with two cases decided by United States Courts of Appeals involving enforceable forum selection clauses in international transactions similar to those at issue in the instant case.

---

**2.** Webster's Third New International Dictionary (1981).

**3.** Webster's Third New International Dictionary (1981).

*Bonny v. Society of Lloyd's,* 3 F.3d 156 (7th Cir.1993); *Roby v. Corporation of Lloyd's,* 996 F.2d 1353 (2d Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993). In *Bonny,* for example, the plaintiffs raised claims under "various federal and state securities laws ⋯." 3 F.3d at 157. The Court of Appeals found that the plaintiffs' substantive rights could be vindicated in England through the remedies provided by English law without "subverting the United States' policy of insuring full and fair disclosure by issuers and deterring the exploitation of United States investors." *Id.* at 161. Similarly, the record in the instant case establishes that remedies exist in England to protect plaintiffs' substantive rights while not subverting their rights under Ohio law. These remedies are stated in the unchallenged affidavit of Barrister John Lewis Powell who states:

> One of the remedies under English law for misrepresentation (whether innocent, negligent or fraudulent) is rescission. In an appropriate case the Plaintiff may not only recover property transferred and money paid to the Defendant, but may also be entitled to an indemnity against liabilities incurred.

(doc. no. 23, attached aff., p. 6). Ohio law provides plaintiffs with a right of rescission similar to that described by Powell; Ohio purchasers may, at their option, void under certain circumstances any sale of securities made in violation of Ohio securities law. *See* Ohio Rev.Code § 1707.43; *see also Riedel v. Acutote of Colorado,* 773 F.Supp. 1055, 1066 (S.D.Ohio 1991); *Bronaugh v. R & E Dredging Co.,* 16 Ohio St.2d 35, 45 O.O.2d 321, 242 N.E.2d 572 (1968).

Powell further indicates that plaintiffs may bring claims based on "the tort of deceit or fraudulent misrepresentation" breach of contract, negligence, and breach of fiduciary duty. *Id.* at 7–8. These remedies are consistent with those identified in *Bonny* as sufficient to protect a plaintiffs' substantive rights, and consequently, enforcement of the forum selection clause does not offend the

public policies of Ohio. *See Bonny,* 3 F.3d at 161–62; *Roby,* 996 F.2d at 1363–66; *see also Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953 (10th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992).

Plaintiffs argue that Ohio's strong public policy of requiring a merit review of securities registered in Ohio will be subverted if the forum selection clause is enforced because English law does not require similar merit reviews. Plaintiffs emphasize that defendants committed illegal acts of selling unregistered, non-exempt securities in Ohio by unlicensed persons.[4] As previously indicated, the right of rescission is afforded under both English law and Ohio Rev.Code § 1707.-43.

This Court agrees with the Magistrate Judge that plaintiffs may not avoid the import of *The Bremen, Bonny,* and *Roby* by relying on the merits of their Ohio claims or by framing their claims under legal theories not recognized in England. *See* doc. no. 26, pp. 10–11. The Courts of Appeals in *Roby* and *Bonny* rejected similar contentions:

> A plaintiff simply would have to allege violations of his country's tort law or his country's statutory law ⋯ in order to render nugatory any forum selection clause that implicitly or explicitly required the application of the law of another jurisdiction. We refuse to allow a party's solemn promise to be defeated by artful pleading.

*Roby,* 996 F.2d at 1360 (emphasis in original).

> Perhaps the United States' securities laws would provide plaintiffs with a greater chance of success ⋯, However, enforcing the clauses here simply means that plaintiffs will have to structure their case differently than if they were proceeding in federal district court.

*Bonny,* 3 F.3d at 162. Indeed, plaintiffs argue that Ohio security laws provide them with a certain chance for success since defendants have conceded that they sold unregistered, non-exempt securities in Ohio. Assuming this is so, however, does not assist

---

**4.** Ohio Rev.Code § 1707.44(A) prohibits an unlicensed person from offering a security for sale in Ohio. Ohio Rev.Code § 1707.44(C) prohibits the sale of securities in Ohio that are not registered in accordance with Ohio statutes and not exempt by Ohio statute.

plaintiffs when the presumption of validity of the forum selection clause and the availability of adequate remedies in England are considered. *See supra*, pp. 622–23.

Accordingly, the Magistrate Judge did not err by "weighing" Ohio's public policy against the policy behind preserving international transactions. Plaintiffs have not established that enforcement of the forum selection clause would contravene Ohio's public policy or would otherwise be unreasonable.

## II.

The Magistrate Judge recommends that plaintiffs' motion for preliminary injunction be granted in the event this Court denies defendants' motion to dismiss.

Defendants contend that the Magistrate Judge did not apply the proper standard to determine whether plaintiffs suffered irreparable harm, and failed to apply the law enunciated in *Basicomputer Corp. v. Scott*, 973 F.2d 507 (6th Cir.1992), and *Hodge Business Sys. v. U.S.A. Mobile Communications*, 910 F.2d 367 (6th Cir.1990), *opinion withdrawn*, 924 F.2d 1058 (6th Cir.1991). Defendants argue that the Magistrate Judge erred in distinguishing the Sixth Circuit precedent which requires a strong showing of fraud to enjoin drawing upon letters of credit.

The standards applicable to a motion for preliminary injunction are well settled and set forth in *Cincinnati Sub–Zero Products, Inc. v. Augustine Medical, Inc.*, 800 F.Supp. 1549, 1559 (S.D.Ohio 1992).

■ This Court finds that plaintiffs' motion for a preliminary injunction is not well taken. Plaintiffs have failed to establish a substantial likelihood of success on the merits of their claims under Ohio securities law. This is so even assuming that defendants sold unregistered, non-exempt securities in violation of Ohio law because plaintiffs face a substantial statute of limitations problem. The parties entered into the agreements containing the forum selection clause in approximately 1986, more than four years prior to filing this action. Under Ohio Rev.Code

§ 1707.43, plaintiffs' right of rescission must be exercised within the shorter of either four years after the transaction or "two years after plaintiffs knew, or had reason to know, of the facts by reason of which the actions ... were unlawful." This Court disagrees with the Magistrate Judge's conclusion that the ongoing nature of the transaction between the parties provides plaintiffs with a substantial likelihood of defeating defendants' assertion of the statute of limitations. Plaintiffs entered into and initially benefited from the transaction for several years. It was only after the transaction became unfavorable to them that plaintiffs advanced their cause of action for violations of Ohio law. Under these circumstances, plaintiffs do not have a substantial likelihood of prevailing by virtue of the Ohio statute of limitations.[5] *But cf. Hild v. Woodcrest Association*, 59 Ohio Misc. 13, 7 Ohio Op.3d 195, 391 N.E.2d 1047 (1977).

Plaintiffs have not shown that they will suffer irreparable injury absent an injunction since the losses they stand to incur are strictly economic. *See Cincinnati Sub–Zero Products*, 800 F.Supp. at 1560. Plaintiffs have failed to explain the manner in which the monetary harm would be irreparable. Defendants correctly assert that plaintiffs' claims to irreparable harm are conclusory and unsupported by the evidence. *See id.* Plaintiffs Shell, Hauck, and Middendorf testified before the Magistrate Judge that they have the use of assets other than those subject to liability under the parties' agreements. *See* doc. no. 31, pp. 11–13. Although plaintiffs may ultimately be liable for their entire net worth, this constitutes substantial rather than irreparable harm. In addition, "[t]he possibility that adequate compensation or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Cincinnati Sub–Zero Products*, 800 F.Supp. at 1560 (quoting *Michigan Coalition v. Griepentrog*, 945 F.2d 150, 154 (6th Cir.1991), and *Sampson v. Murray*, 415

---

**5.** The Court intends no expression of its opinion on the ultimate merits of defendants' statute of limitations defense.

U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974)).

Accordingly, plaintiffs have not shown they will suffer irreparable harm.

■ Finally, the standards for issuance of a preliminary injunction are strictly applied when a party seeks to enjoin demands to be made upon letters of credit, and a party seeking such an injunction must show a substantial likelihood of success in establishing that defendants committed fraud. *See Warner v. Central Trust N.S.*, 715 F.2d 1121, 1124 (6th Cir.1983); *APV Baker, Inc. v. Harris Trust & Sav. Bank*, 761 F.Supp. 1293, 1300–03 (W.D.Mich.1991); *cf. Aetna Life and Cas. Co. v. Huntington Nat. Bank*, 934 F.2d 695, 702 (6th Cir.1991). Enjoining the letters of credit at issue here would constitute an unwarranted intrusion into the integrity of letters of credit in international transactions. Such an intrusion may be warranted in circumstances indicating that defendants committed fraud. *See APV Baker*, 761 F.Supp. at 1300–03; *Aetna Life*, 934 F.2d at 702. The record indicates, however, that plaintiffs were sophisticated and experienced investors who entered the transactions with full knowledge of the letters of credit and of the potential for liability in the amount of their net worth. *Cf. Warner*, 715 F.2d at 1123–24. Plaintiffs, therefore, have not presented sufficient reason to abandon the requirement in the Sixth Circuit of showing a substantial likelihood of succeeding on a claim of fraud. *See Warner*, 715 F.2d at 1124; *APV Baker*, 761 F.Supp. at 1300–02 (W.D.Mich.1991); *cf. Aetna Life*, 934 F.2d 695, 702.

The Magistrate Judge distinguished the *Warner*, *APV Baker*, and *Aetna Life* on the ground that the judgment plaintiffs may obtain in this Court will be unenforceable in England. This distinction is insufficient to avoid the fact that injunctive relief, in the absence of a showing of fraud, would have the effect of allowing plaintiffs to benefit from their transactions (between approximately 1986 and 1989) then allowing them to set aside the burdens of the transactions at a time of their choosing. Not only do letters of credit promise more than that, plaintiffs themselves promised more than that in their 1986 agreement. In the absence of fraud, plaintiffs' promise should not be set aside by granting them preliminary injunctive relief.

Accordingly, in the absence of a substantial likelihood of success and irreparable harm, plaintiffs' motion for preliminary injunction lacks merit.

## ORDER

The Court hereby **ORDERS** that the Report and Recommendation of the United States Magistrate Judge (doc. no. 26) is **ADOPTED** in part and **MODIFIED** in part as follows:

(1) The portions of the Report and Recommendation concerning the background of the case and defendants' motion to dismiss for improper venue are **ADOPTED** in full, and defendants' motion to dismiss (doc. no. 8) is **GRANTED;**

(2) Plaintiffs' complaint is dismissed without prejudice; and

(3) Plaintiffs' supplemental motion for preliminary injunction (doc. no. 7) is **DENIED.**

The case is terminated on the docket of this Court.

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION

STEINBERG, United States Magistrate Judge.

This matter is before the Court on plaintiffs' supplemental motion for preliminary injunction (Doc. 7), defendants' memorandum in opposition (Doc. 10), defendants' response (Doc. 11), plaintiff's reply (Doc. 16), defendants' post-hearing brief (Doc. 18), and plaintiffs' supplemental memorandum (Doc. 25). Also before this Court is defendants' motion to dismiss for improper venue (Docs. 8, 10), plaintiff's memorandum in opposition (Doc. 15), and defendants' post-hearing brief. (Doc. 20).

Plaintiffs, underwriting members or "Names" of the Society of Lloyd's, also known as Lloyd's of London, originally filed their class action complaint for declaratory, rescissionary and injunctive relief against Members' Agent R.W. Sturge Ltd. (Sturge),

the Corporation of Lloyd's (Corporation), the Society of Lloyd's (Society), and the Council of Lloyd's (Council) in the Hamilton County Court of Common Pleas, Case No. A9308995.[1]

The complaint alleges that Sturge sold plaintiffs securities which were not registered and not exempt from registration as required by O.R.C. §§ 1701.01 et seq. (Ohio Blue Sky Laws); therefore, the securities, including all related documents, are illegal and void. Plaintiffs also allege that Sturge sold securities to them through persons not licensed to sell securities in the State of Ohio in violation of the Ohio Blue Sky Laws. Plaintiffs allege that the Corporation, Society, and Council participated in and aided Sturge in the sale of the illegal securities; therefore, they are jointly and severally liable with Sturge. Plaintiffs demand that the action be maintained as a class action; that the sales of the securities be rescinded; that a preliminary and permanent injunction be issued against defendants enjoining them from making any future calls on plaintiffs' and class members' letters of credit or other assets pledged; that plaintiffs and class members be refunded any and all monies lost as a result of their investments with Lloyd's; and that plaintiffs and class members be awarded the costs of the suit, including reasonable attorneys' fees.

On November 2, 1993, the Hamilton County Court of Common Pleas granted plaintiffs an ex parte temporary restraining order enjoining defendants from demanding payment and/or making any calls on plaintiffs' or class members' funds. On November 14, 1993, that Court granted plaintiffs a fourteen day extension of the temporary restraining order. On November 16, 1993, defendants filed a timely notice of removal to this Court pursuant to 28 U.S.C. § 1446(b). (Doc. 1).

A hearing on plaintiffs' motion for a preliminary injunction was held before this Court on November 24, 1993 at which time defendants agreed not to present for payment plaintiffs' or putative class members' letters of credit on or before December 25, 1993. (Doc. 14). The parties also agreed that the venue issue should be resolved prior to a ruling on the preliminary injunction. Accordingly, a hearing on defendants' motion to dismiss for improper venue was held before this Court on December 7, 1993. It was agreed that the parties must object to this report and recommendation within three (3) business days after its filing.

## BACKGROUND [2]

Lloyd's of London is not an insurance company. It is an insurance marketplace in which over 30,000 underwriters conduct the insurance underwriting business. It began in 1688, when Edward Lloyd's coffeehouse in London became a gathering place for marine underwriters and shipowners wishing to insure their vessels and cargoes. Because it was often not economical for an underwriter to assume 100% of a particular risk, a practice of joining to assume parts of a single risk was developed. As a result, a society of underwriters was created and became known collectively as Lloyd's of London or the Society of Lloyd's.

In the mid–1800's, the society of underwriters expanded beyond marine insurance. The Corporation of Lloyd's was created by an Act of Parliament to regulate Lloyd's insurance market. Lloyd's underwriters began insuring U.S. risks at least by 1892. By 1900, Lloyd's had evolved into a sophisticated insurance market. During the early 1900's, regulation of the Lloyd's market rapidly increased to ensure payment of liabilities and protection of policyholders. A 1909 Assurance Companies Act required new members to produce certificates of solvency, as well as making substantial deposits to a trust fund in order to qualify as a Lloyd's underwriter. In 1939, the Lloyd's American Trust Fund,

---

1. For purposes of this Report and Recommendation, the Corporation, Society, and Council are referred to collectively as "Lloyd's."

2. Except as otherwise indicated, this background information is adopted from this Court's Report

and Recommendation filed on October 7, 1993 in *Baker v. LeBoeuf, Lamb, Leiby and MacRae*, Case No. C–1–92–718, and accepted by the parties in the present action as an accurate description of the Lloyd's insurance marketplace.

maintained by Citibank, was established. Today, the assets of this fund exceed eight billion dollars.

Originally, Lloyd's underwriting groups or syndicates tended to be small. In 1856, most syndicates had no more than three members. By 1952, 16 syndicates had 100 or more members. By 1988, there were 376 syndicates, some of which included more than 1,000 members.

Currently, the Corporation of Lloyd's provides facilities and services to assist underwriters in carrying on their business. The Corporation itself does not underwrite any insurance. Its affairs are managed by the Council of Lloyd's, created by the Lloyd's Act of 1982. The Council controls the admission and discipline of members; sets the members' reserve requirements, fees and deposits; provides central accounting, claims adjustment, collections and other services; sets restrictions on and standards for brokers, managing agents, and underwriters, and reviews and processes all policies.

To obtain insurance with Lloyd's, a potential insured must contact a broker in London who is authorized to place business at Lloyd's or contact a broker outside London to whom, through an authorized London broker, certain Lloyd's underwriters have given written binding authority.

To be eligible to underwrite insurance at Lloyd's, one must apply and be sponsored by an existing member. Applicants must satisfy a "means" or net worth test to demonstrate that they possesses sufficient assets to satisfy possible claims and to provide a basis for setting their premium limit. The members, or "Names" as they have become known over the years, have a continuing duty to notify Lloyd's of any material change that affects their declared means. New Names pay a nonrefundable entrance fee and an annual fee that is used to meet the expenses of the Corporation of Lloyd's. The Names must also make certain deposits—the amount of the deposit as well as the Names' means determines the premium limit for particular members.

Each Name selects a Members' Agent, who assists in the application process and advises on the available syndicates. The Members' Agent aids the Name in selecting one or more Managing Agents. The Managing Agent directs the operation of one or more syndicates. Through agency agreements, the Names grant authority for underwriting activities to be conducted on their behalf. Names cannot conduct their insurance business directly. It is typical for a Name to join a number of syndicates in order to spread risks. Names join new syndicates every year. The plaintiffs in this case joined a number of new syndicates each year they remained a member.[3]

British law requires that all premiums received by underwriters and all investment income earned on premiums be placed initially in premiums trust funds, which are used to pay claims and underwriting expenses. Members' Agents control all reserves and premium trusts, subject to guidelines established by the Council of Lloyd's. Profits are released to underwriters only after a three year accounting period required by British law is concluded. This is usually accomplished by transferring the entire portfolio to a reconstituted syndicate by means of reinsurance.

Investment of premiums and investment income is controlled by Members' Agents under guidelines set by the Council of Lloyd's. Members' Agents also authorize all releases of funds to pay claims, expenses, reinsurance, or Names' net profits.

## OPINION

Messrs. Hauck, Middendorf, and Shell became Names with Lloyd's in 1984, 1978, and 1985 respectively. They specifically agreed that their liability would extend to their entire net worth, even though they had no control over the losses inherent in the insurance business. They concede there was no misconduct by defendants in connection with

---

**3.** The parties agreed to this description of the Names' joining of syndicates at the December 7, 1993 hearing.

their original investment sales.[4] In most years, they received profits. In recent years, they suffered losses. Although the future outcome of their investments with Lloyd's is as yet undetermined, they have a reasonable belief that their total losses will far exceed their profits. Plaintiffs seek to sever their relationship with Lloyd's and be returned to their original positions, as if the investments had never occurred. Plaintiffs are willing to return any benefits they may have received by virtue of their investments with Lloyd's. In order to obtain rescission, plaintiffs have turned to the protections allegedly afforded them by the Ohio Blue Sky Laws.

### Plaintiffs' Complaint Must Be Dismissed For Improper Venue

Defendants contend that plaintiffs' complaint lacks proper venue because of the forum selection clauses in the General Undertakings entered into between plaintiffs and the Society and because of the forum selection and arbitration clauses in the Members' Agency Agreements entered into between plaintiffs and Sturge. Defendants contend that their position is supported by *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 658, 121 L.Ed.2d 584 (1993); *Roby v. Corporation of Lloyd's,* 996 F.2d 1353 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 385, 126 L.Ed.2d 333, 62 U.S.L.W. 3319 (Nov. 1, 1993); *Bonny v. Society of Lloyd's,* 3 F.3d 156 (7th Cir.1993), and *Baker v. LeBoeuf, Lamb, Leiby and MacRae,* No. C–1–92–718 (S.D.Ohio filed Oct. 7, 1993) (Steinberg, M.J.). Defendants also contend that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–208, (Convention) requires enforcement of the arbitration and forum selection clauses.

Plaintiffs contend that this suit raises an issue of first impression: whether one who sells securities in Ohio may avoid the state's statutorily mandated investigative and evaluative process through choice of law and fo-

rum selection clauses in a purchase agreement. Plaintiffs contend that the forum selection and arbitration clauses are unenforceable as against Ohio public policy, which requires securities to be registered or exempt from registration and to be sold by licensed dealers. Plaintiffs contend that the Ohio Blue Sky Laws embody a merit review philosophy and therefore provide more protection for investors than do the federal securities laws and state securities laws at issue in *Riley, Roby,* and *Bonny,* which merely protect the investor against fraud and nondisclosure.

Plaintiffs contend that the remedies available to them under English law are inadequate to vindicate their substantive rights under the Ohio Blue Sky Laws; therefore, the forum selection and arbitration clauses sought to be enforced subvert the Ohio Blue Sky Laws. Plaintiffs contend that because the Ohio Blue Sky Laws are based upon a merit review standard rather than a fraud and disclosure standard, any English remedy based on bad faith, fraud, misrepresentation or nondisclosure does not protect the public policy behind the Ohio Blue Sky Laws.

Plaintiffs contend that their transactions with defendants are intrastate sales of securities rather than international commercial transactions. Thus, they distinguish *The Bremen, Riley, Roby,* and *Bonny.* Plaintiffs also contend that defendants' sales of securities were illegal under Ohio law and that all documents evidencing the sale are void, including the General Undertakings and the Members' Agency Agreements, therefore rendering the forum selection and arbitration clauses unenforceable. Plaintiffs contend that because the arbitration clauses are null and void, they are not enforceable under Article II(3) of the Convention. Plaintiffs further contend that the arbitration clauses have no force and effect because Sturge has not formally requested arbitration.

For the purposes of these preliminary issues, defendants have conceded that plaintiffs' investments constitute the sale of secu-

---

4. Plaintiffs do contend that defendants have recently made unilateral changes in the scope of

their obligations. *See infra,* p. 630.

rities. For the same purpose, we assume, *arguendo*, that the sale took place in Ohio.

As a condition to becoming a Name at Lloyd's, each plaintiff signed a General Undertaking, and a representative of the Society was the other signatory. The General Undertaking contains a forum selection clause as follows:

> Each party hereto irrevocably agrees that the court of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting business at Lloyd's....

(Doc. 10, Attachments to Ex. D).

The Members' Agency Agreement entered into between each plaintiff and Sturge also contains a forum selection clause as follows:

> Subject to Clause 22 [5] hereof, the parties hereto irrevocably and unconditionally submit for all purposes of and in connection with this Agreement to the exclusive jurisdiction of the English Courts.

(Hring. Nov. 24, 1993, Def. Ex. A).

■ A forum selection clause in an international agreement is to be enforced "absent a strong showing that it should be set aside." *The Bremen*, 407 U.S. at 15, 92 S.Ct. at 1916. *See Bonny*, 3 F.3d at 159; *Roby*, 996 F.2d at 1362; *Riley*, 969 F.2d at 957. This presumption of validity may be overcome upon a showing that the forum selection clause is "unreasonable under the circumstances," *The Bremen*, 407 U.S. at 10, 92 S.Ct. at 1913. For example: if its incorporation into the agreement was the result of fraud or overreaching, id. at 12–13, 92 S.Ct. at 1914–15; if the complaining party will for all practical purposes be deprived of his day in court due to the grave inconvenience or unfairness of the selected forum, id. at 18; if the forum selection clause contravenes a strong public policy of the forum state, id. at 15; or, if the fundamental unfairness of the chosen law may deprive plaintiff of a remedy. *Roby*, 996 F.2d at 1363 *citing Carnival Cruise Lines v. Shute*, 499 U.S. 585, 594–95, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622 (1991).

Plaintiffs assert that they fall within the latter two exceptions to the presumption.

■ Plaintiffs contend that the predominant public policy of Ohio is the mandate in the Ohio Blue Sky Laws requiring a merit review or an investigation and evaluation of all securities prior to their sale. In order to overcome the presumption in *The Bremen*, plaintiffs must show that this state policy strongly outweighs the policy behind preserving the integrity of international business transactions. *The Bremen*, 407 U.S. at 15, 92 S.Ct. at 1916.

Plaintiffs' contend that the transactions at hand are intrastate sales of securities rather than international transactions. This claim is not supported by the facts. First, there are geographic American and English elements to the transactions rendering them international: plaintiffs are American and defendants are English; many of the documents were executed in Ohio but were prepared in England by the English defendants; plaintiffs made at least one trip to England as a condition precedent to becoming Names; members of Sturge and/or Lloyd's came to Ohio to meet with the Names on an annual basis. Second, the nature of the transactions clearly show they are international. *See supra*, pp. 626–27. Every other court to previously consider this question has found that the Names' membership in the Lloyd's market is part of a fundamentally international transaction. "There is no question that the transaction involved here is truly international." *Bonny*, 3 F.3d at 159 n. 9.

Plaintiffs' reliance on *Hall v. Geiger–Jones Co.*, 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480 (1917) provides weak support for their position. The Court in *Hall* made a passing reference that securities issued by foreign countries may have to be "filed" in Ohio; however, the holding of the Court was that the Ohio Blue Sky Laws in effect at that time were not an undue burden on interstate commerce because they applied only after the security was transported into the state. Id. at 557, 37 S.Ct. at 223. Further, *Hall* was decided well before *The Bremen* and at a time when international transactions were

---

**5.** Clause 22 provides for arbitration of certain disputes between the parties.

smaller in number and of much less importance.

Plaintiffs concede that if they had brought claims based on violations of federal securities laws or claims based on violations of the Ohio Blue Sky Laws sounding in fraud and/or nondisclosure, venue in this Court would be improper. This concession, which is supported by the great weight of legal authority, is an admission that the state and federal policies underlying protection for investors against fraud and nondisclosure must bow to the competing interest in protecting the integrity of international agreements.

Citing *Bronaugh v. R. & E. Dredging Co., Inc.*, 16 Ohio St.2d 35, 40, 45 O.O.2d 321, 242 N.E.2d 572, 576 (1968), which states that the purpose behind the Ohio Blue Sky Laws is to "protect the public from its own stupidity, gullibility and avariciousness," plaintiffs contend that the merit review process affords more protection to investors than do the federal securities laws and the state securities laws at issue in *Bonny* and *Riley* [6], which protect investors against fraud and nondisclosure.

Plaintiffs have not provided any convincing evidence or authority that the merit review process evinces a greater public interest than the prevention of fraud and nondisclosure. To the contrary, the policy concerns behind the prevention of fraud, an intentional wrongful act, are of greater importance and warrant more protection and enforcement than the policy concerns behind a merit review, which is designed to protect investors from the foibles inherent in their own lack of knowledge, lack of business sophistication and greed.[7]

The public policy interests behind many state statutes, even statutes which contain anti-waiver and treble damages provisions, must yield to the countervailing interest in the enforceability of international agreements. *Interamerican Trade Corp. v. Companhia Fabricadoria de Pecas*, 973 F.2d 487

(6th Cir.1992); *Gau Shan Co. v. Bankers Trust Co.*, 956 F.2d 1349 (6th Cir.1992). Otherwise, foreign entities will be discouraged from entering into transactions with Americans and Americans may receive little reciprocity abroad. *The Bremen*, 407 U.S. at 9, 92 S.Ct. at 1912–13; *Gau Shan*, 956 F.2d at 1355.

▪ While not evident from their complaint, plaintiffs' evidence shows that they may have colorable claims against some or all of the defendants based upon breach of contract, breach of fiduciary duty, and possibly misrepresentation, especially if they prove that defendants hold plaintiffs responsible for losses incurred by syndicates which plaintiffs did not join. (*See* Doc. 14. pp. 119–20, 137–39, 193, 195–197). Plaintiffs have chosen not to pursue these claims in an apparent effort to distinguish their cases from *Bonny, Roby,* and *Riley*.[8] However, a plaintiff may not circumvent a forum selection clause merely by electing to state a claim under laws not recognized by the selected forum.

> A plaintiff simply would have to allege violations of *his country's* tort law or *his country's* statutory law or *his country's* property law in order to render nugatory any forum selection clause that implicitly or explicitly required the application of the law of another jurisdiction. We refuse to allow a party's solemn promise to be defeated by artful pleading.

*Roby*, 996 F.2d at 1360 (emphasis in original), cited in *Bonny*, 3 F.3d at 162.

Since plaintiffs have not shown that the state policy behind the Ohio Blue Sky Laws outweighs the public policy supporting the integrity of international agreements, the forum selection clauses should not be set aside. Plaintiffs' artful pleading should not enable them to avoid their voluntary contractual obligations to resolve disputes with defendants in England. *Roby*, 996 F.2d at 1360.

---

**6.** There were no state securities law issues in *Roby*.

**7.** When plaintiffs entered into their investment transactions with defendants, they assumed the risk that the investments would not be successful. To permit the transactions to be rescinded because they have resulted in losses would remove the risk factor inherent in all investment transactions.

**8.** Plaintiffs have conceded that *Bonny, Roby,* and *Riley* were correctly decided.

Plaintiffs' second argument is that there are no remedies available to them in England for the violation of the Ohio Blue Sky Laws; therefore, the forum selection clauses should be set aside. To the extent that plaintiffs are seeking the remedy of a merit review, which they appeared to argue at the hearing, this Court cannot grant such a remedy. Assuming, *arguendo,* that there is no remedy in England for a claim based on a lack of a merit review, there are nevertheless some remedies available to plaintiffs, albeit for claims which plaintiffs have elected not to make.

Defendants have produced uncontradicted evidence that Sturge may incur liability in damages for claims of deceit, fraudulent misrepresentation, negligence, breach of fiduciary duty, and breach of contract. (Doc. 20, Ex. A, Powell Aff. ¶ 12). Plaintiffs may also seek rescission against Sturge on the basis of an innocent misrepresentation. (Id.). Although Lloyd's enjoys certain immunity under the Lloyd's Act of 1982, their immunity is limited only to liability in damages; thus, the equitable relief sought here would be available in England. (Id. at ¶ 8). The Lloyd's Act of 1982 grants no immunity to Lloyd's for acts done in bad faith.

Plaintiffs in this case are no different than the multitude of other plaintiffs here and abroad who have sued Lloyd's entities, raising claims sounding in tort and contract. These other plaintiffs have all been required to pursue their claims in England. The question is not whether a particular remedy does not exist in the selected forum, but whether plaintiffs have any remedies there. *Roby,* 996 F.2d at 1363. Even if plaintiffs have to structure their case differently in the selected forum and even if it is assumed that a different result might be obtained there, the remedy is still considered adequate. *Riley,* 969 F.2d at 958; *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 629, 105 S.Ct. 3346, 3355, 87 L.Ed.2d 444 (1985). In view of the other remedies available though not asserted by

plaintiffs, the forum selection clauses may not be set aside.

Plaintiffs also contend that the sales of securities by defendants were illegal; therefore, all documents evidencing the sale, including the General Undertakings and Members' Agency Agreements containing the forum selection clauses, are void. In order to prevail on this argument, plaintiffs must first establish that the Ohio Blue Sky Laws have been violated. Dismissal of the complaint for lack of venue prevents the Court from making a finding on the merits of this claim.

We are not unmindful of plaintiffs' plight. They are potentially liable to lose their entire net worth. Nevertheless, in the face of *Riley, Roby,* and *Bonny,* cases in three other circuits enforcing identical forum selection clauses in the face of fraud and misrepresentation claims; and *Interamerican* and *Gau Shan,* Sixth Circuit cases addressing forum selection clauses and the importance of international comity, this Court has no choice but to enforce the forum selection clauses and dismiss plaintiffs' complaint, which is not based on defendant's misconduct, for improper venue.[9] We also take heed of the exceptions to the enforcement of forum selection clauses espoused by the Supreme Court in *The Bremen.* However, neither the Ohio Blue Sky Laws, which do not require any intentional misconduct in order to be violated, nor the policy behind the Ohio Blue Sky Laws to protect investors from voluntarily making unwise investments, reflect a state interest strong enough to outweigh the policy concerns behind preserving the integrity of international transactions. Thus, *The Bremen* exceptions have not been satisfied in this case, and there is no choice but to dismiss the case for lack of venue.

### If the Court Were to Find Venue is Proper In this District, the Plaintiffs Should Be Granted a Preliminary Injunction

Should the first part of this Report and Recommendation be rejected and venue established in this District, we recommend that

---

9. Sturge's position is also supported somewhat by the Federal Arbitration Act and the Convention. However, defendants have produced no evidence that an election to arbitrate has been made in this case or that arbitration awards have been granted to any Name. Our decision to dismiss plaintiffs' complaint against Sturge is based on the forum selection clauses in the Members' Agency Agreements rather than on the arbitration clauses.

a preliminary injunction be granted for the following reasons.

The purpose of a preliminary injunction, in contrast to one that is final, is to preserve the status quo until a trial on the merits can be had. *Cincinnati Sub–Zero Products, Inc. v. Augustine Medical, Inc.* 800 F.Supp. 1549, 1559 (S.D.Ohio 1992) (Weber, J.). In determining whether to issue a preliminary injunction, the Court applies the following factors:

(1) whether the party seeking the injunction has shown a substantial likelihood of success on the merits;

(2) whether the party seeking the injunction will suffer irreparable harm absent the injunction;

(3) whether an injunction will cause others to suffer substantial harm; and

(4) whether the public interest would be served by a preliminary injunction.

*Id.* at 1557, *citing Southern Milk Sales, Inc. v. Martin,* 924 F.2d 98, 103 n. 3 (6th Cir. 1991). These four elements are factors to be balanced, not prerequisites that must be met. *In re: DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985). The probability of success that must be shown is inversely proportional to the degree of irreparable injury plaintiffs will suffer without an injunction. *State of Ohio, ex rel., Celebreeze v. Nuclear Regulatory Commission,* 812 F.2d 288, 290 (6th Cir.1987).

Defendants contend that plaintiffs have no substantial likelihood of success on the merits because they have not established that any security was sold in Ohio.[10] Defendants further contend that plaintiffs do not have a valid cause of action under the Ohio Blue Sky Laws because plaintiffs' claims are barred by Ohio's applicable four year statute of limitations.

By virtue of the broad definitions of a security and the sale of a security under the Ohio Blue Sky Laws and by virtue of the uncontroverted facts that the purported se-

curities sold were not registered and that defendants were not licensed, we find that plaintiffs have a substantial likelihood of prevailing on that issue. By virtue of the ongoing nature of the transaction between the parties, we also find that plaintiffs have a substantial likelihood of overcoming an anticipated statute of limitations defense.

Relying foremost on *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974), defendants contend that plaintiffs' anticipated injury is merely economic and, therefore, not irreparable. Defendants contend that, even if economic injury could result in a finding of irreparable harm, plaintiffs have not shown the degree of economic harm necessary for the Court to make such a finding. Defendants also contend that plaintiffs cannot demonstrate that they will suffer irreparable harm absent the injunction, because Lloyd's is pursuing a Name's net worth only in situations where his assets on hand are completely exhausted, and none of plaintiffs fall into this category.

The proposition that monetary loss alone does not constitute irreparable harm is linked to the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation" to the party who was denied the preliminary injunction. *Id.* Plaintiffs have produced uncontroverted evidence that a judgment by this Court against defendants would be neither recognized nor enforced in England.[11] English Civil Jurisdiction and Judgments Act of 1982 § 32. Accordingly, if the preliminary injunction were denied and plaintiffs ultimately prevailed, they would be unable to recoup any funds paid out while the lawsuit was pending and their injury would be irreparable. The protection afforded defendants by the 1982 Act distinguishes this case from *Sampson,* as well as *Basicomputer Corp. v. Scott,* 973 F.2d 507 (6th Cir.1992), and *Hodge Business Com-*

---

10. For the purpose of the motions presently before this Court, defendants stipulated that there was a sale of a security, but not a sale of a security in Ohio. (Doc. 14, p. 43–44).

11. Defendants' argument made in support of their motion to dismiss, that plaintiffs may have remedies available to them in England is of no

merit in this analysis. If the preliminary injunction is being considered, it is only because the motion to dismiss has been denied. In order to deny the motion to dismiss, this Court would have to determine that no meaningful remedy exists in England.

*puter Systems v. U.S.A. Mobile Communications, Inc. III,* 910 F.2d 367 (6th Cir.1990).

Defendants further contend that plaintiffs have not shown with any specificity the degree of economic harm necessary to establish extreme economic injury. We decline to follow *Hillyer v. Commissioner of Internal Revenue Service,* 817 F.Supp. 532 (M.D.Pa. 1993) we are not prepared to hold that a party must be rendered homeless in order to show irreparable harm. The fact that plaintiffs' losses extend to their entire net worth, regardless of what that amount may be (which is really no limit at all) establishes extreme economic injury. Defendants' contention that there is no·immanency of harm to plaintiffs is belied by defendants' "assurance" that a seven day notice will precede the issuance of a writ. The shortness of the notice period suggests the immanency of the harm about to unfold.

Defendants contend that granting injunctive relief would cause Lloyd's insureds to suffer substantial harm by interfering with the payment of their claims. Although defendants have raised the specter of innocent policyholders not receiving payments on their claims should a preliminary injunction be granted, there is no evidence in the record that this would result. To the contrary, plaintiffs have produced evidence of a fund established by Lloyd's to handle the payment of claims which are otherwise unable to be paid by the intended source.

Defendants contend that granting injunctive relief is contrary to the public interest in protecting the integrity of uninterrupted functioning of letters of credit and the enforceability of international agreements.[12] Defendants also contend that plaintiffs have not raised allegations of fraud as required to enjoin payment of letters of credit. However, plaintiffs seek to enjoin defendants from presenting letters of credit, not to enjoin financial institutions from paying letters of credit already presented. Contrary to the cases cited by defendants, no financial institutions are parties in the present case. Simi-

larly, plaintiffs need not show fraud in order to enjoin presentment of the letters of credit by defendants.

We recommend that if a preliminary injunction is issued, it should extend to all persons in the same position as the named plaintiffs: those Names who purchased securities in Ohio from Sturge and whose investments are open or ongoing. In the event that a class action is certified, the scope of those persons protected by the preliminary injunction may be amended as needed. We further recommend that the preliminary injunction enjoin defendants from demanding payment from plaintiffs relative to their underwriting at Lloyd's.

**IT IS THEREFORE RECOMMENDED THAT:**

1) Defendants' motion to dismiss for improper venue be GRANTED; and

2) If the Court rejects recommendation one (1), plaintiff's motion for preliminary injunction be GRANTED.

---

**12.** Defendants' argument that a preliminary injunction would defeat the public interest in preserving international agreements is out of place; if a preliminary injunction is to be granted, it would already have been decided that venue in

this Court is proper. To reach that decision, the Court would have to determine that the state policy behind the Ohio Blue Sky Laws outweighs the public policy in preserving international agreements.