**AETNA LIFE AND CASUALTY COMPANY, Plaintiff–Appellant,**

v.

**HUNTINGTON NATIONAL BANK, Defendant–Appellee.**

**No. 90–3047.**

United States Court of Appeals, Sixth Circuit.

Argued April 9, 1991.

Decided May 20, 1991.

Avrum Levicoff (argued), Anstandig, Levicoff & McDyer, Pittsburgh, Pa., for plaintiff-appellant.

James E. Pohlman (argued), Jennifer T. Mills, Daniel W. Costello, S. Ronald Cook, Porter, Wright, Morris & Arthur, Columbus, Ohio, for defendant-appellee.

Before MARTIN and GUY, Circuit Judges, and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

This case requires the interpretation and application of a provision of the Uniform Commercial Code (UCC), as adopted by the Ohio legislature in Title XIII of Ohio Revised Code (O.R.C.). More specifically, we are concerned with the provision of UCC § 5-114(2), O.R.C. § 1305.13(B), which permits the issuer of a letter of credit to refuse payment, or to dishonor, a draft presented with the letter of credit because of alleged "fraud in the transaction."

In this case the district court found that there was no fraud in the transaction, and entered summary judgment dismissing a claim for reimbursement made by the assignee of the issuing bank. We affirm.

## I.

The plaintiff Aetna Life Insurance and Casualty Company (Aetna) provided fidelity bond coverage to Algemene Bank Nederland, N.V. (ABN) to cover losses to ABN from the misdeeds of its employees. ABN is an international banking institution with its principal office in Amsterdam and a branch office in Pittsburgh, Pennsylvania. The branch manager at ABN's Pittsburgh office was Jan Soels and the assistant manager was Robert Hammar. During the years 1980 and 1981, Soels had authority to lend and extend letters of credit up to $300,000 without approval of ABN's main office.

The defendant Huntington National Bank (HNB) has its principal office in Columbus, Ohio and was the primary lender to Kyova Corporation (Kyova) and its wholly owned subsidiary Tri-State Molded Plastics (Tri-State). Ninety-six percent of the outstanding stock of Kyova was owned by Thomas P. Tyler, who was also its president as well as the president of Tri-State. Tyler was also a principal of Carib Aviation, Inc. (Carib) and Kyova International, Inc. (Kyova Int'l), corporations based in Florida. Both of these latter companies conducted their primary banking business with Royal Trust Bank of Miami.

As a result of their banking relationship, HNB had issued to Kyova and Tri-State a $2.2 million revolving line of credit and held $2 million in notes of these corporations secured by accounts receivable, inventory and other assets. The debt of both corporations was cross-collateralized and was personally secured by Tyler and his wife. By late 1980 HNB had become aware that the financial condition of both these companies had severely deteriorated. Both companies were in default on payments to HNB on the $4.2 million aggregated debt, and HNB assigned a high-risk classification to each company's demand deposit accounts. In 1981 HNB officers discovered that certain of Carib's accounts receivable owned by Kyova were improperly included as collateral under the revolving line of credit. HNB officers also discovered that unregulated cash transfers were being made among several Tyler companies and noted that these accounts needed careful supervision. In order to protect its exposure from loans to Kyova and Tri-State, HNB urged Tyler to acquire financial assistance from another bank. On condition that the cash transfers among the Tyler companies would cease, HNB waived default on its loans to Kyova and Tri-State and renewed the revolving line of credit to prevent possible bankruptcy and forced liquidation of the companies.

In an attempt to manage the seriously deteriorated financial condition of Kyova and Tri-State, Tyler had apparently begun a check kiting scheme between those companies and Carib and Kyova Int'l. To carry out this scheme, Tyler would draw checks on the Miami accounts of Carib and Kyova Int'l payable to the order of Kyova and Tri-State and deposit the checks in the

HNB accounts. At the same time, Tyler would draw checks on the HNB accounts and deposit them into the Miami accounts of Carib and Kyova Int'l. This technique resulted in large book balances in the Tyler-controlled accounts of all four companies. Because both HNB and the Royal Trust Bank in Miami routinely honored checks drawn against uncollected balances, Tyler was able to generate cash by taking advantage of the "float," or the time between the posting of the credit to the depositor's account and the posting of the corresponding debit to the drawer's account.

Concerned about paying checks drawn on large uncollected funds balances, HNB advised Tyler in October 1981 that in order for it to continue to pay checks drawn on the Kyova and Tri–State accounts, the amount of uncollected funds in those accounts must decrease. When those balances did not decrease significantly, HNB dishonored $1.7 million in checks payable to Carib and Kyova Int'l drawn on the uncollected balances of the Tyler-controlled accounts at HNB. On October 26, Tyler apparently alerted HNB that the dishonor of checks drawn on the HNB accounts would most likely result in the dishonor of checks in favor of those accounts drawn on the Miami bank.

In order to deal with the shortfalls of cash in the HNB accounts, Tyler proposed to provide HNB with a letter of credit from another bank that would protect HNB from loss exposure arising out of the continued honoring of checks drawn against the uncollected funds. HNB agreed to this proposal, and on October 28, 1981, Tyler applied for an irrevocable letter of credit from ABN with HNB as beneficiary. On the same date, HNB received a Telex confirmation from ABN's Pittsburgh office that ABN had issued an irrevocable standby letter of credit in the amount of $2 million to cover the net uncollected balance in the Kyova and Tri–State accounts. The confirmation was signed by ABN's branch manager Soels and assistant manager Hammar, both of whom had authority to issue a letter of credit but not in that amount. HNB followed its customary verification procedures to confirm the authenticity of the letter of credit and the signatures, but was unable to detect any irregularities.

Shortly after receiving the letter of credit, HNB determined that the resubmission of the returned checks would result in overdrafts of Kyova's and Tri–State's accounts. Accordingly, HNB concluded that rather than draw upon the letter of credit to cover the uncollected funds balances, it would make loans to Kyova and Tri–State in the amount of the overdrafts and use the letter of credit as security. HNB requested an amendment to the letter of credit to permit the loans, and provided the necessary amending language. ABN amended the letter of credit as proposed by HNB, and by letter dated November 4, 1981, sent the amendment to HNB.

Following confirmation of the amendment to the letter of credit, HNB began extending loans to Kyova and Tri–State to cover overdrafts created by honoring checks drawn on uncollected funds. These loans totalled approximately $2 million by January 1982, at which time ABN informed HNB that there appeared to be irregularities in the issuance of the letter of credit. On January 15 HNB made presentment of a draft and demand for payment on the letter of credit in the amount of $1,987,-902.05, which represented the principal and interest on the loans made to Kyova and Tri–State to cover overdrafts. Shortly thereafter, ABN paid the draft to HNB under a reservation of rights and filed a claim in that amount on its fidelity bond with the plaintiff Aetna. Aetna settled the bond claim with ABN and took an assignment of rights. On January 25, 1982, Tyler, Kyova and Tri–State filed for bankruptcy.

## II.

### A.

In June 1983 Aetna commenced this lawsuit against HNB seeking recovery of its payment to ABN on the fidelity bond. Jurisdiction was based on diversity of citizenship, and the substantive law of Ohio con-

trols our decision. The complaint alleged that HNB knew or should have known that Tyler was conducting a check-kiting scheme and that HNB therefore conspired with Tyler to procure the letter of credit, despite knowledge or reason to know that the letter of credit was fraudulent. In addition, the complaint alleged that at the time of presentment and demand on the letter to ABN, HNB was not a holder in due course since it had notice of defenses to the letter of credit. In its answer, HNB denied all allegations of fraud on its part, and the action was scheduled for pre-trial discovery. Following discovery, HNB twice moved for summary judgment and both motions were denied.

Shortly before the scheduled trial date, HNB filed a motion in limine requesting that the court limit Aetna's proof in its case in chief to the question of whether there was fraud in the transaction by HNB, that it preclude the plaintiff from introducing evidence in its case in chief of HNB's failure to disclose to ABN the credit-worthiness of Tyler, and to defer proof until plaintiff's rebuttal case on the issue of whether HNB was a holder in due course. The district court, in considering the motion in limine, noted that under the UCC as adopted by Ohio, the obligation of the issuing bank to honor a letter of credit is generally independent of the underlying contract between the issuer's customer and the beneficiary of the letter of credit. The district court reasoned that while Aetna, as ABN's subrogee, could complain about fraud surrounding the letter of credit contract itself, that contract was independent of underlying agreements between its customer and the beneficiary, and that Aetna, therefore, could not rely on fraud in other transactions. The court noted that this "independence principle" governing letter-of-credit transactions would only be disregarded if the issuer can establish "fraud in the transaction." In order to come under this exception, the court ruled that payment can be refunded or enjoined only if the beneficiary of the letter of credit, rather than the customer, has been guilty of intentional fraud. The court therefore granted HNB's motion in limine to structure the proof, bifurcating the case and ordering that Aetna must initially establish that HNB actively and intentionally misrepresented to ABN that Kyova, Tri–State or Tyler was credit-worthy or that HNB concealed a fact that it had a duty to disclose to ABN. Only if one of these circumstances were established would the court address the question of whether HNB was a holder in due course.

### B.

After the motion in limine was granted, the plaintiff apparently represented to the district court that it had no evidence that would satisfy the court's order to first prove active and intentional fraud by HNB, and therefore it could not proceed. Because of Aetna's inability to make a showing in its case in chief that it could establish fraud in the transaction as defined by the district court, the district court on its own motion ordered the plaintiff to show cause why summary judgment should not be granted in favor of the defendant. After a hearing at which Aetna was unable to show any new fact tending to demonstrate HNB's intentional fraud or violation of a duty to disclose, the district court entered summary judgment against Aetna and dismissed the case.

In dismissing the action, the district court reiterated its prior holdings that in order to establish fraud in the transaction within the meaning of O.R.C. § 1305.13 (adopted verbatim from UCC § 5–114), the plaintiff must show that the beneficiary was guilty of intentional fraud, and that intentional fraud could be shown by establishing the common law elements of fraud.

In granting summary judgment the district court stated:

> It is uncontroverted, according to the plaintiff's counsel's representations to the court ... that HNB employees did not make representations to ABN or were involved in obtaining the letter of credit other than specifying to their customers, Tyler, the language necessary to make the letter of credit acceptable to HNB. That is, there appears to be no

evidence of representations which would support active fraud or even create a duty to disclose.

## III.

We look first at the district court's decision to order the proof in such a way as to preclude evidence of whether HNB was a holder in due course during Aetna's case in chief.

■ A letter of credit is an engagement by a bank at the request of a customer that the issuing bank will honor drafts or other demands for payment upon compliance with any conditions specified in the letter. O.R.C. § 1305.01. An issuer must honor a draft or demand for payment that complies with the terms of the letter of credit regardless of whether there is some problem concerning the underlying contract between the issuer's customer who procured the credit and the beneficiary to whom it was issued. O.R.C. § 1305.13(A). The issuing bank's obligation to honor drafts drawn by the beneficiary of a letter of credit is distinct from any duty owed by its customer under an agreement with the beneficiary. *All Service Exportacao v. Banco Bamerindus*, 921 F.2d 32, 35 (2d Cir.1990). This "independence principle" is subject to a narrow exception, creating defenses to a demand because of defects in the underlying transaction between the issuer's customer and a third party. Three defenses [1] are set forth in O.R.C. § 1305.13(B):

> (B) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title, pursuant to section 1307.35 of the Revised Code, or of a security pursuant to section 1308.17 of the Revised Code, or is forged or fraudulent or there is fraud in the transaction ...

The two subsections under § 1305.13(B) describe the issuer's rights where one of the three defenses has been established:

(1) the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course ...

(2) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents ...

In the present case Aetna seeks reimbursement from HNB on the grounds that there was fraud in the transaction and that HNB was not a holder in due course. Aetna appears not to understand the relationship between the three exceptions to the independence principle contained in § 1305.13(B) and the reference to holder in due course in § 1305.13(B)(1). Aetna appears to argue that it could establish fraud in the transaction by proving that HNB had knowledge of defenses that would have prevented its being a holder in due course of the letter of credit. In arguing that summary judgment was improper, Aetna asserts that it was prepared to produce expert witnesses who would testify that, given the fact of the precarious financial condition of its Tyler-related customers and its knowledge of large cash transactions among various Tyler entities, HNB should have had doubts about the integrity of the letter of credit.

■ The district court held, in effect, that it is immaterial whether HNB was a holder in due course unless ABN can show fraud in the transaction, and knowledge by a beneficiary sufficient to deprive it of holder in due course status does not satisfy the requirement for proving fraud in the transaction. The right of the issuer to dishonor depends first upon a showing of fraud in the transaction. Unless the issuer can establish fraud in the transaction (or one of the other subsection (B) defenses)

1. The three defenses are (1) a required document does not conform to certain specified warranties; or (2) a required document is forged or fraudulent; or (3) there is fraud in the transaction. In this case, Aetna relies only on "fraud in the transaction."

the duty to honor is absolute. The holder in due course question comes into play only after fraud in the transaction is proven. Subsection (B)(1) provides, in effect, that even if such fraud is established, the issuer is bound to honor the letter of credit if it is presented by a holder in due course. At this point, the presenter has the burden of proving its holder in due course status. The issuer may dishonor only upon proving fraud in the transaction coupled with failure of the person demanding payment to show that it is a holder in due course.

These burdens of proof are established in O.R.C. § 1303.36(C) which states that "[a]fter it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course." See also, *Banco Espanol de Credito v. State Street Bank and Trust Co.,* 409 F.2d 711, 712–13 (1st Cir.1969); *Bank of North Carolina v. Rock Island Bank,* 630 F.2d 1243, 1247–49 (7th Cir.1980). Thus, we believe the district court properly construed § 1305.13 and did not abuse its discretion in bifurcating the proceedings and establishing the order of proof.

## IV.

We look, then, to determine whether the district court correctly ruled that the plaintiff's lack of proof on the issue, as defined by the district court, entitled the defendant to summary judgment.

## A.

The UCC does not define "fraud in the transaction," and neither have the Ohio courts defined it. The cases cited by the parties and others we have read, however, either state or assume that the fraud must have been perpetrated by the beneficiary in order to permit an issuer to dishonor a letter of credit. No case, so far as we can discover, has held that an issuing bank is relieved of its duty to honor a letter of credit because its own employees acted fraudulently in issuing the credit. The reason is obvious. As between an issuing bank and the beneficiary of a letter of credit, the bank is in a superior position to ensure the honesty of its own employees and the beneficiary has no right to monitor or control their activities. When the party seeking reimbursement for the loss is an insurer of the fidelity of the issuer's employees, for which protection it has been paid a fee, the arguments for shifting the loss to the beneficiary are even less forceful.

In this case Aetna argues, without having produced corroborating evidence in response to the district court's show cause order, that Tyler and ABN's employees conspired to issue the unauthorized letter of credit and that a factual issue exists as to whether HNB knew that the letter of credit had been procured through improper means. The problem with this argument is that Aetna proffered no evidence to implicate HNB, the beneficiary, in the fraud. As we have noted, the cases applying the fraud in the transaction exception to the duty to honor involve situations where the beneficiary, not the customer, has been guilty of fraud. See, *Itek Corp. v. First Nat'l Bank of Boston,* 730 F.2d 19 (1st Cir.1984); *KMW Int'l v. Chase Manhattan Bank,* 606 F.2d 10 (2d Cir.1979); *Roman Ceramics Corp. v. Peoples Nat'l Bank,* 714 F.2d 1207 (3d Cir.1983); *United States v. Mercantile Nat'l Bank at Dallas,* 795 F.2d 492 (5th Cir.1986); *Bossier Bank & Trust Co. v. Union Planters Nat'l Bank,* 550 F.2d 1077 (6th Cir.1977); and *Harris Corp. v. National Iranian Radio and Television,* 691 F.2d 1344 (11th Cir.1982). See also, Note, *"Fraud in the Transaction": Enjoining Letters of Credit During the Iranian Revolution,* 93 Harv.L. Rev. 992, 1004 (1980), where the author states, "the legislative history of 5–114(2) indicates that 'fraud in the transaction' was meant to embody an exception to the independence principle ... based solely on the beneficiary's misperformance of the underlying contract."

Aetna has failed to present to this court a single case that clearly applies the fraud in the transaction exception to a situation involving the malfeasance of the customer rather than the beneficiary. The only case

upon which it relies to argue that the exception should apply beyond acts of the beneficiary is *Northwestern Bank v. NCF Financial Corp.*, 88 N.C.App. 614, 365 S.E.2d 14 (1988). That case involved an action by the letter of credit beneficiary against the issuing bank who refused to pay on the letter arguing that it had been procured by a fraudulent scheme between one of its employees and the letter of credit customer. The North Carolina court concluded in that case that "it may be argued that where a beneficiary extends a loan relying on a letter of credit which he knows was procured through fraud on the issuer, the statement of default of the underlying loan is a product of fraud entitling the issuer to one of the exceptions." 365 S.E.2d at 20. But in order for the issuing bank to take advantage of this potential argument, the court concluded that the issuer must submit evidence to the jury of the beneficiary's knowledge of the fraud. Therefore, Aetna's reliance on this case is misplaced. Instead of directly applying one of the exceptions under UCC § 5–114 to the wrongful acts of the customer in procuring the letter of credit from the issuer, the North Carolina court stated only that an issuer's duty to honor the letter *may* be discarded if the beneficiary knew of the customer's wrongful acts. Even under this case, the focus of the exceptions remains on the knowledge or complicity of the beneficiary rather than the acts of the customer.

We are satisfied that Ohio courts would adopt this universally accepted view that "fraud in the transaction" refers to fraud by the beneficiary. See *Winston Corp. v. Continental Casualty Co.*, 508 F.2d 1298, 1304 (6th Cir.), cert. denied, 423 U.S. 914, 96 S.Ct. 218, 46 L.Ed.2d 142 (1975) (When the courts of the state whose law controls have not spoken, a federal court sitting in diversity must "exercise [its] judgment based upon applicable principles of state law, upon relevant decisions in other jurisdictions, and upon [its] own conceptions of sound and just rules.").

## B.

▮ Aetna next contends that the district court erroneously held that it could prove fraud in the transaction only by reference to the six elements of fraud as defined by the courts of Ohio. Aetna argues for a more flexible definition, relying on cases that have found fraud in the transaction involving less egregious conduct than required by the common law definition of fraud. *Emery–Waterhouse Co. v. Rhode Island Hospital Trust Nat'l Bank*, 757 F.2d 399 (1st Cir.1985) is such a case. The court in *Emery–Waterhouse*, quoting *Itek Corp. v. First Nat'l Bank of Boston*, 730 F.2d 19, 25 (1st Cir.1984), stated "when a beneficiary 'has no plausible or colorable basis under the contract to call for payment of the letters, its effort to obtain the money is fraudulent.'" 757 F.2d at 405. In that case it was shown that the bank acting for the beneficiary had conducted an investigation and knew beyond dispute that most of the money for which it presented demands on the letter of credit was not owed.

The court upheld dishonor in a somewhat similar case in *Bank of Newport v. First Nat'l Bank & Trust Corp. of Bismark*, 687 F.2d 1257 (8th Cir.1982). The court found that a beneficiary presented a draft and a letter of credit knowing that a condition of the letter of credit had not been met and that it was being used for an improper purpose. In addition, the beneficiary retained equipment under a security agreement, making achievement of the purpose for which the letter was used impossible. The court found that there was fraud in the transaction.

Both *Emery–Waterhouse* and *Bank of Newport* are readily distinguishable from the present case. In both cases the bank that presented the letter of credit had positive knowledge either that the money was not owed or that the letter was being used for an improper purpose. Furthermore, in *Bank of Newport* the bank that demanded payment of drafts drawn on the letter of credit deliberately took an action that prevented its customer from complying with the terms of the underlying agreement. In short, the presenting bank in both cases engaged in direct, intentional fraud.

The situation in the present case is quite different. Obviously, HNB knew that its

Tyler-related customers were in precarious financial straits. That was HNB's reason for demanding that Tyler furnish it with additional security. When Tyler produced a letter of credit from another bank with which the Florida Tyler companies had an existing relationship, HNB made the customary checks to determine that the letter was in proper form and that the signatures were authentic. There was no concealment of the purpose for which HNB wanted and would use the letter of credit. When HNB decided to make loans to Kyova and Tri–State to cover overdrafts, it requested and received from ABN an amendment to the letter of credit specifically making it security for such loans.

### C.

We need not decide whether fraud in the strict common law sense is required to establish "fraud in the transaction." At a minimum, however, it is necessary that the issuer show intentional fraud. *All Service Exportacao,* supra, 921 F.2d at 35. That is what is missing in this case. There is evidence that ABN's employees and Tyler may have conspired to act fraudulently in issuing the letter of credit. But nothing in this record links HNB to any such fraud. It was stipulated that ABN had a banking relationship with the Florida Tyler-related entities prior to issuing the letter of credit. It was also stipulated that Soels and Hammar were authorized signers of letters of credit issued by ABN. Aetna produced no evidence to indicate that HNB knew that this particular letter of credit was "irregular" until ABN so notified HNB just prior to the expiration date of the letter.

The district court required Aetna to show some intentional fraud by HNB to avoid summary judgment. The court made clear, however, that there were alternative means of satisfying this requirement. In its opinion and order granting summary judgment the court stated:

> This Court ruled in our March 31, 1989 and again in a [sic] April 3, 1989 Order, that to establish fraud in the transaction contained in Ohio Rev.Code § 1305.13 and U.C.C. § 5–114, a beneficiary must have been guilty of intentional fraud. Said intentional fraud could be active

fraud, whereby Huntington National Bank actively and in an overt manner contacted individuals at ABN and offered misrepresentation [sic] which were material, made falsely, with knowledge of said falsity, with the intent to mislead ABN into reliance, which in fact they did rely upon resulting in injury. (Citations Omitted). Alternatively, intentional fraud could be established by showing that a duty on behalf of HNB arose by their partial disclosures made to individuals at ABN.

The court then found that Aetna had failed to establish the existence of facts to support either form of fraud. There was no evidence of active fraud or of partial disclosures that would have triggered a duty to make a complete disclosure. As we have stated previously, Tyler did not produce ABN's letter of credit out of the blue. HNB knew that ABN had a banking relationship with other Tyler-related companies. It clearly had no duty to disclose any information to ABN concerning the financial activities or condition of ABN's own customers. Likewise, the record shows that ABN made no inquiries about Kyova or Tri–State before issuing the letter of credit. Under these circumstances HNB had no duty to advise ABN concerning the financial condition of HNB's customers. *Central States Stamping Co. v. Terminal Equipment Co., Inc.,* 727 F.2d 1405, 1409 (6th Cir.1984).

### CONCLUSION

Letters of credit facilitate commercial and financial transactions by supplying a guarantee of payment that functions independently of transactions between the issuer's customer and the beneficiary. If an issuer could resist payment of drafts upon presentment by seeking to show irregularities of just any kind in the underlying transaction between its customer and the beneficiary, letters of credit would not be reliable as facilitating methods. We emphasized this point in *Security Finance Group v. N. Ky. Bank and Trust,* 858 F.2d 304 (6th Cir.1988), clarified 875 F.2d 529 (1989):

> The letter of credit's primary value to the financial world is its reliability.

Without it, a borrower requesting a loan would be unable to obtain funds. In such a situation, the lender must rely on the credit instrument to ensure that payment will be made. Emphasis of the underlying arrangements instead of the document itself ... undermines the security and the reliability of the letter of credit by making payment contingent upon relationships unknown to a lender or to a party relying upon it. If the lender may not rely upon the strength of the document itself, the letter of credit becomes unreliable and therefore worthless.

858 F.2d at 307 (citations omitted).

ABN failed to produce evidence of fraud in the transaction within the meaning of § 1305.13 and, thus, it had no defense to HNB's demand for payment under the irrevocable letter of credit. Aetna, as assignee of ABN's rights, stands in no better position. The district court properly entered summary judgment for HNB.

The judgment of the district court is affirmed.