PHILLIPS COLLEGE, INC., Plaintiff,

v.

Richard W. RILEY, Secretary of the Department of Education, Defendant.

Civ. A. No. 93–1703 (CRR).

United States District Court, District of Columbia.

Feb. 15, 1994.

Jonathan B. Hill, Michael B. Goldstein, Blain B. Butner, and Sean D. Hughto, Dow, Lohnes & Albertson, Washington, DC, for plaintiff.

Michael T. Ambrosino, Asst. U.S. Atty., together with J. Ramsey Johnson, U.S. Atty., and John D. Bates, Asst. U.S. Atty. (Donald C. Phillips, Office of Gen. Counsel, Dept. of Educ., of counsel), for defendant.

CHARLES R. RICHEY, District Judge.

Before the Court are the parties' cross Motions for Summary Judgment in the above-captioned case. In its Complaint for Temporary, Preliminary and Permanent Injunctive and Declaratory Relief, plaintiff Phillips Colleges, Inc. ("PCI") alleges that defendant Richard W. Riley, Secretary of the Department of Education ("the Department"), violated Title IV of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. § 1070 *et seq.*, and § 706(2) of the Administrative Procedure Act ("APA"). More specifically, the plaintiff challenges the Department's decision to collect approximately $2.2 million from the Bankers Trust Company by drawing on a standby Letter of Credit ("LOC") established by PCI in favor of the Department, on the grounds that this draw exceeds the Department's statutory authority and is arbitrary and capricious and otherwise not in accordance with the Department's regulations. The issue before the Court is whether the Department's draw on the LOC was proper.

After careful consideration of the papers filed by the parties, the oral arguments made by counsel at the motions hearing, the underlying law, and the entire record in this action, the Court shall grant the Defendant's Motion for Summary Judgment.

## I. *FACTS.*

There is no dispute as to the material facts in this case. PCI owns and operates over 40 colleges throughout the country in 21 states. Thousands of students attend these colleges, which offer specialized programs in such areas as data processing, paralegal studies, secretarial training, and business administration. These colleges participate in student financial assistance programs ("SFA Programs") authorized under Title IV of the HEA.

During the week of March 18, 1991, the Department program review staff conducted a program review audit of PCI's corporate offices (the "1991 Program Review"). This review evaluated PCI's administration of the Pell Grant, Supplemental Educational Opportunity Grant, Perkins Loan, and Guaranteed Student Loan programs. Issued on September 25, 1991, the Department's Program Review Report stated that the Department found a high occurrence of late Stafford Loan and Pell Grant refunds for the colleges sampled, and concluded that PCI must "review the files of all students for whom a Title IV refund was required to be made who attended any of the Phillips Colleges during the 1987–88, 1988–89, 1989–90, and 1990–91 award years," submit certain specified information concerning these refund transactions, and have an independent CPA review and certify the pertinent information.

In March, 1992, PCI engaged the firm of Weworski & Associates, CPA ("Weworski")

to perform the review required by the Department in its September 25, 1991 Program Review Report. The Department, PCI, and Weworski negotiated and agreed upon procedures implemented by Weworski in evaluating the accuracy and completeness of the refund information. Specifically, these procedures consisted of examining a statistical sample of the refund transactions for the period in question.

In April, 1992, following a review of plaintiff's resources, the Department determined that PCI no longer met the financial responsibility requirements for the SFA programs specified in the Department's regulations. More specifically, as indicated in a later agreement, PCI agreed with the Department that "34 C.F.R. § 668.13, a regulatory provision implementing Title IV of the HEA, sets forth standards of financial responsibility that an institution must satisfy in order to begin and to continue to participate in the Title IV programs," and that "PCI and the Colleges did not demonstrate financial responsibility under 34 C.F.R. § 668.13(d) in the manner specified by the Department...." Subsequently, PCI began negotiations with the Department to continue its federal funding, culminating in their entering into a Financial Responsibility Agreement ("FRA") on July 24, 1992.

The FRA required that the Department of Education be provided a Letter of Credit ("LOC") in the amount of $5 million, and the original LOC was issued for the Department's benefit on June 18, 1992. Under the FRA, PCI agreed that "[t]he circumstances giving rise to the Department's right to draw on the letter of credit are set forth in the letter of credit and are not conditioned upon or subject to any term of this Agreement...." The LOC assures the Department payment where the Department presents the LOC, together with a statement by the Secretary or representative of the Secretary, certifying that:

(a) THE FUNDS AMOUNTING TO U.S. $____ DRAWN UNDER BANKERS TRUST COMPANY LETTER OF CREDIT NO. S-08574 ARE DRAWN DUE TO THE CLOSING OR OTHER FAILURE OF PHILLIPS COLLEGES, INC. (THE "INSTITUTION") TO PROVIDE SERVICES FOR WHICH ITS STUDENTS RECEIVING FINANCIAL ASSISTANCE UNDER TITLE IV OF THE HIGHER EDUCATION ACT OF 1965, AS AMENDED (HEA) HAVE CONTRACTED, OR FAILURE OF THE INSTITUTION TO COMPLY WITH THE REQUIREMENTS OF TITLE IV OF THE HEA; AND

(b) THE FUNDS RECEIVED IN PAYMENT OF THIS DRAWING WILL BE USED TO:

(1) PAY REFUNDS OF INSTITUTIONAL OR NON-INSTITUTIONAL CHARGES OWED TO OR ON BEHALF OF CURRENT OR FORMER STUDENTS OF THE INSTITUTION, WHETHER THE INSTITUTION REMAINS OPEN OR HAS CLOSED.

(2) PROVIDE FOR THE "TEACH-OUT" OF STUDENTS ENROLLED AT THE TIME OF THE CLOSURE OF INSTITUTION.

(3) PAY ANY LIABILITIES OWING TO THE SECRETARY OF EDUCATION ARISING FROM ACTS OR OMISSIONS BY THE INSTITUTION, ON OR BEFORE THE EXPIRATION OF BANKERS TRUST COMPANY LETTER OF CREDIT NO. S-08574, IN VIOLATION OF HEA REQUIREMENTS, INCLUDING APPLICABLE REGULATIONS, OR FROM ANY VIOLATION OF ANY AGREEMENT ENTERED INTO BY THE INSTITUTION WITH THE SECRETARY REGARDING THE ADMINISTRATION OF PROGRAMS UNDER TITLE IV OF THE HEA.

The FRA does not limit the Department's right to draw on the LOC, with the exception that the FRA states that the Department must "afford PCI fifteen (15) days to make direct payment of any sums that the Department may otherwise draw upon the letter of credit." Significantly, the FRA also mandates that

PCI shall, within twenty (20) days of any draw by the Department upon said letter of credit, restore the value of the letter of credit to five million dollars ($5,000,000) or

such greater amount as PCI has been required to post and maintain.... Failure to post or to maintain said letter of credit shall constitute a material breach of this Agreement.

In addition, the FRA subjects PCI to certain oversight procedures, such as requiring PCI to retain an accounting firm to perform quarterly compliance reviews.

On January 29, 1993, Weworski issued a report ("Weworski Report") identifying $445,201 in total interest and special allowance liability, calculated on the entire refund population for the audited period, and stating that the sample summary encompassed $3,939,061 worth of refunds. Mr. Weworski explicitly stated that this latter figure represented refunds, and not liabilities.

Based on Weworski's report, the Department made a demand on plaintiff and a presentment to Bankers Trust for $4,384,262 on April 30, 1993, informing PCI that $3,939,061 of this draw would be "to cover unpaid, delinquent refunds due by PCI under the Title IV programs." PCI was given 15 days to make payment to the Department before the draw would go forward. At the conclusion of its April 30, 1993 letter informing PCI of its intent to make this draw, the Department stated that "[i]f you have any questions concerning this letter, please contact Carol Bengle in the Office of the General Counsel...." PCI then contacted the Department in an attempt to persuade the Department not to go ahead with the draw. As a result of negotiations between the two parties, they agreed that PCI would provide a supplemental report from Weworski ("Weworski Supplement") containing extrapolated liability figures from the findings Weworski made with regard to the statistical sample in the first report. Furthermore, PCI increased by ten percent (or $500,000) the funds secured by the LOC, pursuant to the Department's

right to require such an increase under the FRA. On May 17, 1993, the Department agreed to rescind its threat of April 30, 1993, to draw on the letter of credit.

On June 18, 1993, PCI forwarded a copy of the Weworski Supplement to the Department. Extrapolating from a sample designed to be an estimate of liability and using a confidence level of 95%, the Weworski Supplement projected liabilities of $2,194,554.13.[1] On August 5, 1993, the Department made another demand on PCI. Stating its reliance on the Weworski Report and Supplement, the Department concluded that these studies identified liabilities of $2,194,554.13 and demanded payment from PCI in that amount. In the event PCI failed to make payment, the Department informed PCI that the Department would draw on the LOC. The LOC does not state any requirement that the Department render a final agency determination prior to the draw.

On August 25, 1993, the Department made presentment against the LOC by presenting (1) a draft in the amount of $2,194,554, and (2) the certified statement reading as required by the terms of the letter of credit. The following day, Bankers Trust Company paid the Department's draft by electronically transferring the funds to the Department's control. At the time of this presentment, the Department was confident that it had sufficient information available to it necessary to identify, student by student, lender by lender, and program by program, where every dollar of the $2,194,554 should be placed. Furthermore, the Department's draw on the LOC certified that PCI had failed to provide services for which its students have contracted and/or failed to comply with requirements of Title IV of HEA.[2] On September 15, 1993, the 20 day restoration period allowed

1. In its objections to the Defendant's Statement of Material Facts as to Which There is No Genuine Issue, PCI notes that this figure was not adjusted by amounts identified in the Weworski Supplement as "over refunds and duplicate refunds," which are presented in a table entitled "Computation of Effect of Over Refunds and Duplicate Refunds on Refund Project Findings" in that Supplement. As the preamble to the latter table states, "This information [concerning

the effects of over refunds and duplicate refunds] has been provided to enable the U.S. Department of Education to evaluate the overall effect of over refunds and duplicate refunds and determine if an offset against liability assessments would be appropriate."

2. The parties dispute whether this certification was proper.

PCI under the FRA expired without PCI making restoration of the amount drawn.

On August 17, 1993, PCI filed a Complaint and Motion for Temporary Restraining Order and Preliminary Injunction. Judge Stanley Harris denied the Motion for Temporary Restraining Order on August 23, 1993. On August 30, 1993, this Court granted PCI's Motion for Consolidation of Hearing on the Preliminary Injunction with Trial on the Merits, pursuant to Rule 65.

## II. *STANDARD FOR SUMMARY JUDGMENT.*

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

## III. *THE DEPARTMENT'S DRAW ON THE LOC MET THE LOC'S TERMS AND CONDITIONS.*

█ The centerpiece of this litigation is the Letter of Credit, originally issued by the parties on June 18, 1992. As our Circuit has recently stated, a transaction involving this financial mechanism functions in the following way:

> the buyer arranges for a bank—whose credit the seller will accept—to issue a letter of credit in which the bank agrees to pay drafts drawn on it by the seller if, but only if, such drafts are accompanied by specified documents, such as bills of lading or air freight receipts, representing title to the goods that are the subject matter of the transaction between buyer and seller. The bank undertakes this obligation for a specified period of time.

*Confeccoes Texteis de Vouzela v. Riggs Nat'l Bank of Washington, D.C.*, 994 F.2d 851 (D.C.Cir.1993) (citations omitted). Therefore, "a credit transaction deals in documents and is wholly independent of the underlying transaction in goods." *Id.* (citations omitted). This independence principle revolves around the central function of a letter of credit—certainty of payment. *Centrifugal Casting Machine Co. v. American Bank & Trust*, 966 F.2d 1348, 1352 (10th Cir.1992); *see also Wood v. R.R. Donnelley & Sons Co.*, 888 F.2d 313, 318 (3rd Cir.1989) ("Pennsylvania considers this independence necessary to preserve the 'basic policy of letter of credit law,' namely 'to ensure prompt payment to sellers.'") (quoting *Roman Ceramics Corp. v. Peoples Nat'l Bank*, 714 F.2d 1207, 1212 (3rd Cir.1983)).

In the strict sense that its presentment was facially valid with respect to the terms stated on the LOC, it is clear and undisputed that the Department's draw on the LOC was proper. The terms set forth in the LOC are clear and unambiguous, in that the Department must certify: (1) the amount being drawn; (2) that PCI failed to provide services for which its students have contracted and/or failed to comply with requirements of Title IV of HEA; and (3) that the funds will be used for some or all of the purposes set forth in the LOC.

Both parties agree that the Department's draw on the LOC with Bankers Trust specified the amount being drawn as $2,194,554. Although PCI argues that the Department failed to make a showing that such a specific amount was due and owing, the Court notes that the LOC contained no condition requiring the Department to do so. Further, both agree that the Department certified to Bankers Trust that PCI had failed to provide services for which its students have contracted and/or failed to comply with Title IV of HEA, and that the funds will go towards refunds and to reimburse the Department for overpayments regarding interest and special payments.

PCI does strenuously object to the Department's characterization of these certifications as "proper," in that PCI argues (repeatedly) that the Department has not made a final

administrative determination regarding a program review to support its statements. PCI also disputes the amount of the liability figure, on the grounds that the Supplemental Weworski Report does not provide a sufficient or accurate determination of its liability. However, PCI does not deny its failure to comply with the requirements of Title IV. Moreover, nothing in the LOC mandates that the Department render a final agency decision in determining the extent of violations committed.

The Plaintiff is correct in pointing out that neither the independence principle nor any other law of credit can provide an absolute shield to the Government in this action. The Court's inquiry must go beyond the question of whether the Department followed the LOC's formalities in making its presentment, and address the more substantive questions of whether its decision to make the draw violated the APA.

## IV. BECAUSE THE LOC'S UNDERLYING CONTRACT IS THE FRA AND NOT THE DEPARTMENT'S REGULATIONS, AND BECAUSE PCI FAILED TO PERFORM ON THE UNDERLYING CONTRACT, THE DEPARTMENT'S DRAW ON THE LOC WAS PROPER.

■ It is a well-established principle that a letter of credit arrangement has three relationships. *E.g., Wood v. R.R. Donnelley & Sons Co.,* 888 F.2d 313, 317 (3rd Cir.1989); *see Aetna Life & Casualty Co. v. Huntington Nat'l Bank,* 934 F.2d 695, 699 (6th Cir.1991). The first is the underlying contract, the "true" bargain between the customer (PCI) and the beneficiary (the Department). The second relationship is between the customer and the issuer. The third is the letter of credit itself, which is the issuer's contract to pay the beneficiary upon the submission of certain documents.

■ PCI argues that the contract underlying the LOC is the Higher Education Act, and that a letter of credit is merely a payment mechanism guaranteeing the beneficiary the right to immediate collection of money once a liability has become due and owing. *See Norfolk & Western Ry. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 129, 111 S.Ct. 1156, 1164, 113 L.Ed.2d 95 (1991) ("Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms."). The Plaintiff criticizes the Defendant for adopting a position in which the Government can draw at will from a letter of credit under a theory of "pay now, argue later." *See* Defendant's Motion for Summary Judgment at 9–10 (citing *Eakin v. Continental Ill. Nat'l Bank and Trust Co. of Chicago,* 875 F.2d 114, 116 (7th Cir.1989)). According to the Plaintiff's claim, the statutory and procedural framework established by Title IV and its implementing regulations are the "underlying contract" behind the LOC, and the Department's failure to obey these rules and regulations and issue a final determination means that PCI did not fail to perform its obligations. In an attempt to show capriciousness in the Defendant's position, PCI argues that if the Department were to follow the logical extension of its approach that the 1991 Program Review is some sort of ongoing dispute process, it would enable the Government to make a draw at a mere hint of a liability and hold the money until the Program Review's completion.

In putting forth these contentions, the Plaintiff misreads the context of the LOC. As the FRA states, PCI "shall maintain in effect an irrevocable letter of credit in favor of the Secretary." FRA at 3. Because the LOC is a product of that Agreement, the Court concurs with the Defendant that it is the FRA itself that is the "underlying contract." Furthermore, merely because the LOC refers to certain HEA requirements as certification benchmarks to trigger payment, the entire set of regulations promulgated pursuant to HEA are not incorporated into the LOC.

Most importantly, the FRA does not mandate exhaustion of the program review process as a predicate to the Department's ability to draw on the LOC. The underlying contract explicitly defines the boundaries for the LOC's interpretation:

The circumstances giving rise to the Department's *right* to draw on the letter of credit are set forth in the letter of credit and are not conditioned upon or subject to any term of this Agreement, except for the conditions requiring that the Department afford PCI an opportunity to make a direct payment.

FRA at 4 (emphasis added). PCI could have negotiated different terms and conditions, or they could have not signed the FRA and LOC, in which case the administrative process would continue; evidently, it chose to do neither. Therefore, the terms of the LOC controls the Department's right to draw on the LOC.

## V. BECAUSE THE FACTS CERTIFIED IN THE DEPARTMENT'S DRAW ARE TRUE, CONTRARY TO PCI'S ACCUSATIONS, THE DRAW SHOULD NOT BE REVERSED AS ARBITRARY, CAPRICIOUS, WRONGFUL, OR UNLAWFUL.[3]

■ The Plaintiff directly challenges the certification statements made by the Department to Bankers Trust Co. as being outright *false*. According to the Plaintiff, the Department's reliance on the Weworski Supplement as its basis for its demand and threatened draw raises concerns of incompetence and illegality on the Department's part. PCI asserts that the Government mistakenly thought that Weworski was the accountant retained by PCI under the FRA, relating to prospective or current refunds made after the FRA was signed, when in fact Weworski's analysis concerned past refunds relating to the Department's 1991 program review. Therefore, according to the Plaintiff, the Department's certification is based on a mistake of fact and is therefore false, and the draw should be returned.

As stated previously, because the unambiguous terms of the LOC do not hinge on any sort of final agency determination, the facts certified by the Department in its presentment were true. As the Government indicates, the language of the LOC does not support the Plaintiff's argument. The LOC does not restrict the methodology under which the Department may determine PCI's non-compliance with Title IV. The Department followed the terms of the LOC in relying on the Supplemental Weworski Report, which found that PCI had failed to pay refunds to lenders and had led the Department to overpay interest and special allowances totalling $2,194,554.13. Although Plaintiff observes that this report found overpayments of student refunds, and argues that these overpayments should be offset against underpayments, the Department nevertheless acted properly in certifying that PCI had failed to comply with HEA. Any miscalculation regarding an offset of liabilities does not change the underlying fact that PCI did not comply with Title IV.

PCI also takes issue with the Defendant's statement that "[a]t the time the Department made presentment on the LOC, the Department was confident that it had available to it sufficient information available to it necessary to identify, student by student, lender by lender, and program by program, where every dollar of the $2,194,554 should be placed." Opposition to Plaintiff's Motion for Preliminary Injunction at 18–19. According to PCI, such a "statement is misleading at best, if not dishonest," because Weworski merely extrapolated his findings, and the Department ignored Weworski's offset. Plaintiff's Motion for Summary Judgment at 32–33. However, PCI then acknowledges that the Department has available to it the information necessary to identify the refunds due by student, lender, and program, but complains that the Department has not yet done so, "and in PCI's view, is not likely to undertake the massive and costly task." *Id.* at 33. As the Government observes, what is impor-

---

**3.** At oral argument and the footnotes of its papers, the Plaintiff also accuses the Department of fraud in drawing on the LOC. *See, e.g.,* Plaintiff's Opposition, at 24 n. 11. Under this theory of common-law fraud, the Plaintiff would have to show, *inter alia,* that "the contract deprives the beneficiary of even a *'colorable'* right to [call a letter of credit ...'" and that "that the beneficia-

ry's demand for payment has 'absolutely no basis in fact,' ...'" *Ground Air Transfer v. Westates Airlines, Inc.,* 899 F.2d 1269, 1273 (1st Cir.1990) (citations omitted). Because the Plaintiff cannot even show that the Department's certifications were false, much less not "colorable," it falls far short of demonstrating fraudulent behavior by the Department.

tant here is not PCI's speculation regarding what the Department may do, but that the LOC only requires that the Department certify that the funds will be used for some or all of the purposes set forth in the LOC.

## VI. BECAUSE THE DEPARTMENT ACTED IN A MANNER CONSISTENT WITH THE TERMS OF THE LOC, IT COMPLIED WITH SECTION 5–111 OF THE UNIFORM COMMERCIAL CODE.

■ According to Section 5–111(1) of the Uniform Commercial Code, entitled "Warranties on Transfer and Presentment," the "beneficiary by . . . presenting a documentary draft or demand for payment warrants to *all interested parties* that the necessary conditions of the credit have been complied with." U.C.C. § 5–111(1) (emphasis added). Arguing that the Department's false certifications breach the presentment warranty of § 5–111(1), PCI relies heavily on *Mellon Bank, N.A. v. General Elec. Credit Corp.*, 724 F.Supp. 360 (W.D.Pa.1989). *Mellon* held that, because only $15,000 was actually owed at the time of the draw in that case, a beneficiary's "assertion that $600,000 was due and owing was erroneous, and constitutes a breach of warranty under § 5–111." *Id.* at 364. PCI parallels *Mellon* to the case at hand, on the theory that the Department's draw was based on a "premature assertion of amounts due and owing," and that "[t]he Department knew at the time of its certification that it had not yet identified the individual refund payments to be made and that the draw amount, therefore, reflected nothing more than the estimate of a *third-party* as to the ultimate liability." Defendant's Opposition, at 27, 30.

The Court does not agree. Unlike the LOC signed by the parties in this case, the letter of credit in *Mellon* contained a "due and owing" clause as a requirement. Therefore, no final determination as to a precise amount of monies "due and owing" is necessary here. In addition, as stated *supra*, any "knowledge" that the Department may have

had in terms of its lack of identification of individual payees is not relevant under the LOC, as the LOC requires only that the Department certify the *purposes* for which the funds will be used.

## VII. THE DEPARTMENT'S DRAW ON THE LOC DID NOT ABRIDGE PCI'S RIGHTS UNDER THE APA OR DUE PROCESS CLAUSE.

■ One of PCI's principal arguments is that the Department violated the statutory and regulatory procedures required by the HEA regarding the program review of an institution. Under 20 U.S.C. § 1094(b), the Department must issue a "final program review determination" as the culmination of a program review, and the institution is entitled to appeal that determination administratively. The regulations implementing this statute sets out the procedure for such a review, in which an administrative law judge explains whether the final program review determination was supportable. 34 C.F.R. § 668 ("Subpart H"). Therefore, PCI reasons, the Department has violated the controlling statute and regulations by failing to issue a final program review determination in connection with the 1991 Program Review, and failing to allow PCI its administrative appeal. Accordingly, PCI asserts that the draw was premature and violated its statutory, regulatory, and due process rights.[4] *Motor Vehicle Mfrs. Ass'n of the United States v. Ruckelshaus*, 719 F.2d 1159, 1164 (D.C.Cir. 1983) ("Agency action is arbitrary and capricious if the agency has failed to meet statutory, procedural, or constitutional requirements") (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971)).

The Court concludes that the Department's actions have not violated any of the Plaintiff's rights. As the Court stated at length previously, the LOC did not require exhaustion of administrative action before the Department could make a draw. The Court also distinguishes cases such as *Esch v. Yeutter*, 876 F.2d 976 (D.C.Cir.1989), which

---

**4.** Section 706(2)(B) of the APA authorizes courts to make an independent assessment of constitu-

tional issues.

the Plaintiff cites to demonstrate a situation where a court found an agency action to be contrary to its procedural regulations, because *Esch* did not involve a letter of credit or other financial mechanism in which a party negotiated a payment based on a similar document.

The Court also finds it significant that *PCI still possesses its rights to challenge the amount of the draw through the program review framework.* The Supplemental Weworski Report led the Department to make the draw on the LOC, but PCI will receive a full administrative hearing to determine the precise amount of its liability to the Department under the program review. Because PCI may attempt to show that the liabilities charged are excessive in the manner specified by statute, and the Department may respond in kind, PCI's due process rights have not been abridged.[5]

Declaring the draw to be contrary to law would also be contrary to the broader principles of the right to contract and fairness to the parties in this case. The purpose of a letter of credit is not to deny a subsequent challenge to the legitimacy of a beneficiary's claim, but to make sure that "contractual disputes wend their way towards resolution with money in the beneficiary's pocket rather than in pocket of the contacting party." *Itek Corp. v. First Nat'l Bank of Boston,* 730 F.2d 19, 24 (1st Cir.1984). The LOC was negotiated at arm's length, and PCI is a sophisticated consumer of federal educational funding. Because PCI knew that the process of its program review was already underway, allowing PCI to have a full agency determination before the Department can draw on the LOC would give PCI an additional bite of the apple. In drawing on the LOC and permitting the regulatory process to determine the precise amount of liability, the Department's actions are clearly consistent with the underlying concept of "pay now, argue later" that governs this area of law.

## VIII. CONCLUSION.

The letter of credit that is the focus of this litigation clearly and unambiguously sets forth three requirements for certification. The Court finds that in its presentment of August 25, 1993, the Department properly complied with these conditions. Furthermore, in light of the fact that PCI has sufficient administrative paths of review to challenge the accuracy of the draw of $2.2 million, the Court concludes that the Department's actions did not violate the APA or the Constitution. Therefore, the Court shall enter summary judgment for the Defendant.

The Court shall enter an Order of even date herewith in accordance with this Opinion.

### ORDER

Before the Court are the parties' cross Motions for Summary Judgment in the above-captioned case. After careful consideration of the parties' Motions, all the papers filed in this case, and the applicable law, and for the reasons articulated in the Opinion of the Court of even date herewith, it is, by the Court, this 15th day of February, 1994,

ORDERED that the Defendant's Motion for Summary Judgment shall be, and hereby is, GRANTED; and it is

FURTHER ORDERED that the Plaintiff's Motion for Summary Judgment shall be and hereby is DENIED; and it is

FURTHER ORDERED that the above-captioned case shall be, and hereby is, DISMISSED from the dockets of this Court.

---

5. In April, 1992, after the Department's determination that Phillips did not satisfy the financial responsibility standards to participate in Title IV programs, Phillips chose not to pursue its right to a hearing under 20 U.S.C. § 1094 and Subpart H. Soon after, it entered into the FRA, which clearly stated that "PCI and Colleges did not demonstrate financial responsibility under 34 C.F.R. § 668.13(d) in the manner specified by the Department." The LOC permitted the Government to access the money for which it believed PCI was liable, and to adjudicate the precise amount of the program review through the regulatory process.